1

2

3

4

5

6

7

8

9

10

11

12

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

VERONICA J. CAPOEMAN,

                           Plaintiff,

     v.

MICHAEL J. ASTRUE, Commissioner of the
Social Security Administration,

                           Defendant.

CASE NO.  10cv5371BHS

REPORT AND RECOMMENDATION

Noted for May 13, 2011

        This matter has been referred to United States Magistrate Judge J. Richard Creatura

pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR 4(a)(4), and as

authorized by Mathews, Secretary of  H.E.W. v. Weber, 423 U.S. 261, 271-72 (1976).  This

matter has been fully briefed. (See ECF Nos. 16, 20, 21.)

        After considering and reviewing the record, the undersigned finds that the ALJ

improperly evaluated the medical evidence and plaintiff's testimony, committing legal error.

Therefore, the undersigned recommends this case be REVERSED and REMANDED.

REPORT AND RECOMMENDATION - 1

BACKGROUND

Plaintiff was born on October 15, 1969 (Tr. 79), and has a high school education (Tr. 454, 456). She received some training at ITT Technical Institute, and worked as a social services clerk, among other jobs, until 1994 when she became disabled and unable to work (Tr. 96, 456).

PROCEDURAL HISTORY

On June 12, 1996, plaintiff filed an application for Supplemental Security Income benefits, and on July 8, 1996 filed an application for Disability Insurance benefits (Tr. 79-82, 451, 455). Her applications were initially denied and denied on reconsideration (Tr. 451-57). On June 7, 2000, she had a hearing before Administrative Law Judge Denny Allen (hereinafter "ALJ Allen") (Tr. 451). On July 11, 2000, ALJ Allen issued a written decision (Tr. 454-57). ALJ Allen concluded that plaintiff had been under a disability since April 1, 1994, through the date of the decision (Tr. 451, 454, 456).

On May 13, 2004, defendant Administration informed plaintiff that it had determined that her "health ha[d] improved" and that she was no longer under a disability as of May 1, 2004 (Tr. 463-67). As part of the explanation, defendant Administration noted that she had only "had [] one seizure in the past year, and [] had less pain and inflammation in her joints," demonstrating good muscle strength and normal movement (Tr. 468, 1092). This determination was upheld on reconsideration (Tr. 46). An administrative hearing was held on September 12, 2007 before Administrative Law Judge Edward Nichols (hereinafter "the ALJ") (Tr. 1084-1115).

Plaintiff testified at this hearing that since she became disabled, she was diagnosed with "interstitial cystitis" (Tr. 1089, 1092). She was first prescribed Uriced for this condition in approximately 1997, but "now," in September, 2007 it "seems to be getting worse" (Tr. 1092). Plaintiff testified that this condition results in many painful urinary tract infections (Tr. 1089),

which cause her to have a need to utilize restroom facilities "about every hour" (Tr. 1090) for "at least five minutes" on each occasion (Tr. 1091).

Plaintiff also testified at her hearing that although her seizures are no longer "grand mal" (Tr. 1092), she has about three or four seizures a year (Tr. 1093) in which she "get[s] weak, [] break[s] out in a sweat and [] can't move for a while" (Tr. 1092). Plaintiff testified as to her diagnosis of fibromyalgia and her experiences of "pain, stiffness, and just a lot of pain" (Tr. 1094-95). Plaintiff testified extensively regarding her pain resulting from fibromyalgia, as well as this pain increasing her incidents of seizure (Tr. 1095-98). In addition, plaintiff testified regarding her diagnoses of plantar fasciitis (Tr. 1098-99), and asthma (Tr. 1099-1100).

On October 18, 2007, the ALJ issued a decision upholding the cessation of benefits (Tr. 43-56). The ALJ found that plaintiff had not engaged in substantial gainful activity (Tr. 48). The ALJ found that plaintiff, as of May 1, 2004, had the medically determinable severe impairments of: "a syndrome of arthralgias or fibromyalgia; a syndrome of either seizures or anxiety, of uncertain etiology; interstitial cystitis; plantar fasciitis; and asthma" (Tr. 48, 49). He also found that medical improvement occurred as of May 1, 2004, and that this improvement was related to plaintiff's ability to work "because it has resulted in an increase in [plaintiff's] residual functional capacity" (Tr. 49). The ALJ found, among other things, that plaintiff was capable of light work (Tr. 49), and that her disability ended on May 1, 2004 (Tr. 55).

On March 26, 2010, the Appeals Council denied plaintiff's request for review, making the ALJ's October 18, 2007 written decision the final decision subject to judicial review (Tr. 12-14).

On May 25, 2010, plaintiff filed a proposed complaint, and filed a complaint on May 28, 2010, seeking review of the October 18, 2007 written decision of the ALJ (see ECF Nos. 1, 4;

Tr. 46-56). In her opening brief, plaintiff contends that the ALJ failed to evaluate properly the (1) medical and (2) testimonial evidence, (3) incorrectly assessed her residual functional capacity and (4) incorrectly found plaintiff capable of returning to her past relevant work (see ECF No. 16, p. 1).

STANDARD OF REVIEW

To determine whether a claimant's disability has ceased, the ALJ must follow an eight-step evaluation process for the Title II claim and a seven-step process for the Title XVI claim. 20 C.F.R. §§ 404.1594(f), 416.994. At step one (Title II only), the ALJ must determine whether or not the claimant is engaging in substantial gainful activity. 20 C.F.R. §§ 404.159(f)(1). At step two of the Title II sequential analysis, and step one of the Title XVI sequential analysis, the ALJ must determine whether or not claimant has an impairment that meets or medically equals a Listing. 20 C.F.R. §§ 404.159(f)(2).

Next, (step three, Title II/ step two, Title XVI), "the Commissioner must determine whether there has been 'any [medical improvement, i.e.,] decrease in the medical severity of [the claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant was] disabled or continued to be disabled.'" Potts v. Commissioner of Social Security Administration, 357 Fed. Appx. 49, 50 (9th Cir. 2009) (per curiam) (unpublished) (quoting 20 C.F.R. § 404.1594(b)(1), (f)(3)); see also 20 C.F.R. § 404.1594(a).

Subsequently, (step four, Title II/ step three, Title XVI), the ALJ must determine whether any medical improvement is related to the ability to work. 20 C.F.R. § 404.159(f)(4). The ALJ next considers whether or not an exception to medical improvement applies. 20 C.F.R. §§ 404.159(f)(5), (d), (e). At step six of the Title II analysis, (step five, Title XVI), the ALJ must determine whether or not the claimant's current impairments in combination are severe. 20

REPORT AND RECOMMENDATION - 4

C.F.R. § 404.159(f)(6). At step seven of the Title II sequential analysis, (step six, Title XVI), the ALJ assesses claimant's residual functional capacity and determines whether or not she can perform her past relevant work. 20 C.F.R. § 404.159(f)(7). If the ALJ reaches the final step in the sequential analysis, the ALJ will assess claimant's ability to do other work, given her age, education and past work experience. 20 C.F.R. § 404.159(f)(8).

The burden to prove disability and continuing entitlement to disability benefits is on plaintiff. 42 U.S.C. § 423(f)(1). However, there must be substantial evidence that medical improvement has occurred. Id. Plaintiff's burden to establish disability "is a continuing one" that "neither shifts nor ends after an initial determination of disability has been made." Ward v. Schweiker, 686 F.2d 762, 765 (9th Cir. 1982) (*citing* Patti v. Schweiker, 669 F.2d 582, 586 (9th Cir. 1982)) (other citations omitted).

## DISCUSSION

1. The ALJ failed to evaluate properly the medical evidence.

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician or psychologist. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (*citing* Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)); see also Edlund v. Massanari, 253 F.3d 1152, 1158-59 (9th Cir. 2001) ("the ALJ erred in failing to meet, either explicitly or implicitly, the standard of clear and convincing reasons required to reject an uncontradicted opinion of an examining psychologist") (*citing* Lester, supra, 81 F.3d at 830). Even if a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31 (*citing* Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)). In addition, the ALJ must explain why

his own interpretations, rather than those of the doctors, are correct. <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998) (*citing* <u>Embrey v. Bowen</u>, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented."  <u>Vincent on Behalf of Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam)(emphasis in original).  The ALJ must only explain why "significant probative evidence has been rejected."  <u>Id</u>. (*quoting* <u>Cotter v. Harris</u>, 642 F.2d 700, 706-07 (3d Cir. 1981)).

a.  <u>Dr. James States, M.D., examining physician, May 13, 2004</u>

On May 13, 2004, Dr. James States, M.D., (hereinafter "Dr. States"), examined plaintiff (Tr. 773-76). Dr. States noted plaintiff's subjective complaints in his report (Tr. 773-75). Dr. States also made objective observations. (Tr. 775-76). Plaintiff's mental status examination revealed that she presented "irritable and mostly frustrated," although her affect appeared stable (Tr. 775). Dr. States diagnosed plaintiff with dysthymic disorder, ADHD – inattentive, and depression (Tr. 776).

Regarding Dr. States medical opinion, the ALJ states that:

> This report is given consideration, but it was a bit vague and speculative; there is no other proof of ADHD. [Plaintiff]'s ongoing ER reports, discussed above, do not show any significant difficulty with attention or memory.

(Tr. 51).

First, regarding the ALJ's assessment that Dr. State's report was "a bit vague and speculative," the Court notes that Dr. States included specific quotations from plaintiff in the subjective portion of his report (<u>see</u> Tr. 773, 775). In addition, Dr. States also noted specific objective observations from the mental status examination he performed on plaintiff, such as that she could only recall after a delay one of the three terms: "roof, car, basketball," and that she was "not sure" regarding the meaning of the proverb "bird in hand  = 2 in bush" (Tr. 776). He also

made specific diagnoses and provided for a very specific plan for plaintiff (id.). Therefore, the Court finds that the ALJ's assessment of Dr. States' medical opinion as "a bit vague and speculative" has little, if any, support in the record.

The ALJ also discounts Dr. States' medical opinion with his conclusion that "there is no other proof of ADHD" (Tr. 51).The court notes that the ALJ indicated subsequently in his written decision that "DDS reviewing psychologists evaluated the file and determined that [plaintiff] had possible attention deficit disorder, [ADD]" (Tr. 53 (*citing* Tr. 801-14)). Dr. Thomas Clifford, Ph.D, in the report cited by the ALJ, indicated that plaintiff suffered from "possible ADHD, inattentive" (Tr. 802). Therefore, the Court concludes that the ALJ's effort to discount Dr. States medical opinion by noting "no other proof of ADHD" provides little support for his decision to discount Dr. States' medical opinion.

The only other reason for not crediting fully the medical opinion by examining physician Dr. States was that "[Plaintiff]'s ongoing ER reports, discussed above, do not show any significant difficulty with attention or memory" (Tr. 51). It is not likely that notations in an ER report regarding plaintiff's attention and memory are based on an extensive mental status examination performed by a psychiatrically trained physician, as were the conclusions by Dr. States regarding plaintiff's mental health (see Tr. 767-70, 773-76). Indeed, the ER reports cited by the ALJ indicate short combined neurological/psychiatric sections, containing a small amount of check boxes, and no mental status examination (Tr. 639, 649, 668, 673, 769, 781). In addition, at least one of these ER reports indicates that plaintiff *was* experiencing psychiatric difficulties, as the "mood/affect [normal]" line is *not* checked (Tr. 781). Another of the ER reports does not have a section where an evaluator would include psychiatric impairments, so, this report is likely not to indicate any psychiatric impairments, even if they were present and observed (see Tr. 677-

79). Therefore, based on a review of the relevant record, the Court concludes that the ALJ's conclusion that "[Plaintiff]'s ongoing ER reports, discussed above, do not show any significant difficulty with attention or memory" (Tr. 51), does not provide much support for the ALJ's determination to not give significant weight to the medical opinion by Dr. States.

Even if the ALJ determined that Dr. States' medical opinion was contradicted by other evidence in the record, Dr. States' medical opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31. For the reasons already discussed, the Court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence in the record in support of his rejection of the medical opinion provided by Dr. States.

   b. Dr. Alyson Roby, M.D., treating physician, April, 2001 – April, 2006

Although the ALJ acknowledged that Dr. Alyson Roby, M.D., (hereinafter "Dr. Roby"), was a "treating source," he nevertheless finds Dr. Roby's report "not particularly convincing" (Tr. 52). Dr. Roby concluded that plaintiff would miss work "more than three days per month because of illness (internal citation to exhibit 50F)" (Tr. 52, 883).

The ALJ discounts the medical opinion by treating physician Dr. Roby with his own assessment of the objective medical evidence and by concluding that only subjective evidence supports the finding in Dr. Roby's opinion that plaintiff had a "'known' seizure disorder" (Tr. 52 (despite giving plaintiff "a point in her favor" for taking Tegretol to control her seizures)).

The ALJ refers to particular instances where plaintiff's neurological examination was "negative" or "normal" (id.) The ALJ also notes multiple emergency room treatments by plaintiff for repeated painful urinary tract infections, and makes his own assessment that "these conditions

are not particularly significant and there is nothing to show that they would result in absences several times a month" (id.). However, Dr. Roby, plaintiff's treating physician, evaluated the same objective medical evidence, and concluded that plaintiff would miss work "more than 3 days/month due to illness" (Tr. 883).

When an ALJ makes his own interpretation of the medical evidence, and his interpretation is contrary to that of a treating physician, the ALJ must explain why his own interpretations, rather than those of the doctors, are correct. Reddick , supra, 157 F.3d at 725. The Court concludes that the ALJ did not explain adequately why his own interpretation regarding how often plaintiff would need to miss work due to the severity of her symptoms, over that of treating physician, Dr. Roby, is correct.

In addition, even if the ALJ determined that Dr. Roby's medical opinion was contradicted by other evidence in the record, her medical opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31. For the reasons already discussed, the Court concludes that the ALJ failed to provide specific and legitimate reasons supported by substantial evidence in the record in support of his rejection of the medical opinion provided by Dr. Roby.

Because the ALJ failed to evaluate properly the medical evidence provided by Dr. States and Dr. Roby, the undersigned recommends that this matter be reversed and remanded to the Administration for further consideration.

2.    The ALJ failed to evaluate properly plaintiff's credibility.

If the medical evidence in the record is not conclusive, sole responsibility for resolving conflicting testimony and questions of credibility lies with the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1999) (quoting Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971)

(*citing* Calhoun v. Bailar, 626 F.2d 145, 150 (9th Cir. 1980))).  The ALJ also may "draw inferences logically flowing from the evidence."  Sample, 694 F.2d  at 642 (*citing* Beane v. Richardson, 457 F.2d 758 (9th Cir. 1972); Wade v. Harris, 509 F. Supp. 19, 20 (N.D. Cal. 1980)).  An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment.  Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (*citing* 42 U.S.C. § 423(d)(5)(A)). Even if a claimant "has an ailment reasonably expected to produce *some* pain; many medical conditions produce pain not severe enough to preclude gainful employment." *Fair*, 885 F.2d at 603 (emphasis in original).

Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons." Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (*citing* Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)). If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so.  Greger v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "'must specifically identify what testimony is credible and what evidence undermines the claimant's complaints.'"  Id. at 972 (*quoting* Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)); Reddick, 157 F.3d at 722 (citations omitted); Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996) (citations omitted). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness, inconsistencies in testimony, daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." Smolen, 80 F.3d at 1284. The decision of the ALJ should "include a discussion of why reported daily activity limitations or restrictions are or are not reasonably consistent with the medical and other evidence." SSR 95-5p 1995 SSR LEXIS 11. "[I]f a claimant 'is able to spend a *substantial part*

1  of her day engaged in pursuits involving the performance of physical functions that are

2  transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a

3  claimant's allegations.'" Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir. 2001) (*quoting*

4  Morgan, 169 F.3d at 600).

5      The determination of whether to accept a claimant's testimony regarding subjective

6  symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929; Smolen, 80 F.3d at

7  1281 (*citing* Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).  First, the ALJ must determine

8  whether there is a medically determinable impairment that reasonably could be expected to cause

9  the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); Smolen, 80 F.3d at 1281-82.

10  Once a claimant produces medical evidence of an underlying impairment, the ALJ may not

11  discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of

12  objective medical evidence to fully corroborate the alleged severity of pain." Bunnell v. Sullivan,

13  947 F.2d 341, 343 (9th Cir. 1991) (*en banc*) (*citing* Cotton, 799 F.2d at 1407).  Absent

14  affirmative evidence that the claimant is malingering, the ALJ must provide "clear and

15  convincing" reasons for rejecting the claimant's testimony. Smolen, 80 F.3d at 1283-84;

16  Reddick, 157 F.3d at 722 (*citing* Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996); Swenson v.

17  Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

18      The ALJ did "not find [plaintiff] entirely credible" (Tr. 54). The vast majority of support

19  for this conclusion by the ALJ comes from his own interpretations of the medical evidence (see

20  Tr. 50-54). When an ALJ makes his own interpretations of the medical evidence, and his

21  interpretations are contrary to those of the doctors, the ALJ must explain why his own

22  interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 725.

23  Here, in his written decision, the ALJ makes numerous assessments contrary to those of the

REPORT AND RECOMMENDATION - 11

doctors and psychologists (see Tr. 50-54). For example, the ALJ discounts plaintiff's credibility because he concludes that "the record does not show any seizures at all" (Tr. 54). However, the March, 2001 ER report, cited by the ALJ previously (Tr. 50), includes the clinical impression of "petit mal seizure" (Tr. 601). The ALJ made his own interpretation (Tr. 50), over that of the evaluating medical source (Tr. 601), and then used his interpretation to discount plaintiff's credibility.

In addition, the Court notes that the ALJ utilized his own interpretation of the medical evidence to justify his adverse credibility rating with the conclusion that there is a lack of objective medical evidence to corroborate fully the alleged severity of plaintiff's pain and other symptoms (see Tr. 50-55). However, once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of pain." Bunnell, supra, 947 F.2d at 343. When there is no evidence that a claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Smolen, 80 F.3d at 1283-84; Reddick, 157 F.3d at 722. Dr. Roby, plaintiff's long-term treating physician, indicated that she "do[es] not believe that [plaintiff] is a malingerer" (Tr. 883), and the relevant record does not provide evidence to the contrary. The only reason other than the lack of objective evidence given by the ALJ in support of his adverse credibility finding is plaintiff's daily activities.

The ALJ found that "[plaintiff] told the hearing officer that she did household chores . . . . and she reported that she had no problem with daily activities other than taking occasional breaks" (Tr. 54). However, plaintiff testified that after only fifteen minutes of doing dishes she has to sit down and take a break due to the pain in her knees and lower back (Tr. 1103). She also

testified that she does not vacuum, sweep, mop or do yard work, and "all[she] do[es] is [] the dishes and some laundry" (Tr. 1103). Therefore, the ALJ's finding that plaintiff "reported that she had no problem with daily activities other than taking occasional breaks" clearly is erroneous (Tr. 54). Likewise, based on a review of the relevant record, the Court concludes that the ALJ's conclusion that plaintiff "is fully independent in her daily living activities" also clearly is erroneous (id.).

Finally, the ALJ concludes that plaintiff is "fully independent in her daily living activities, including the care of three children she has borne since her alleged onset date" (id.). However, plaintiff testified that she is unable to lift her 46-pound three year old (Tr. 1096). She also testified that "the father of [her] two last children takes on a lot of responsibility for the children" (Tr. 1100). She further testified that he takes care of them when she needs to lie down during the day (Tr. 1101). Plaintiff testified that he had a job where he could "go to work anytime during the day," and that she "was able to call him and he was able to come home if [she] needed him to come home" (Tr. 1102). The ALJ "discredit[ed] that statement," because "[h]e is in the forest doing ranger tasks and it would be very unlikely that he could drop his duties and come to her whenever she called and needed something" (Tr. 54).

In situations like the one here, when there is no evidence that a claimant is malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Smolen, 80 F.3d at 1283-84; Reddick, 157 F.3d at 722. The Court concludes that the reasons given by the ALJ in support of his rejection plaintiff's testimony were not "clear and convincing," See Smolen, 80 F.3d at 1283-84; Reddick, 157 F.3d at 722. Therefore, this legal error provides an independent basis to reverse and remand this matter to the Administration.

CONCLUSION

After considering and reviewing the record, the undersigned finds that the ALJ improperly evaluated the medical evidence and plaintiff's testimony, and therefore recommends that this matter be reversed and remanded to the Administration for further consideration. Because of these particular legal errors, on remand, the ALJ should begin at step two of the Title II sequential analysis, (step one of the Title XVI sequential analysis).

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. See 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on May 13, 2011, as noted in the caption.

Dated this 18th day of April, 2011.


J. Richard Creatura
United States Magistrate Judge